

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

TEJAL D. SHAH
TELEPHONE: (212) 336-0121
EMAIL:  SHAHTE@SEC.GOV

September 10, 2019

**VIA ECF and UPS Overnight**

Hon. William H. Pauley III
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY  10007-1312

    Re:    <u>SEC v. Sugarman</u>, 19-cv-5998 (WHP)

Dear Judge Pauley:

    We represent Plaintiff Securities and Exchange Commission (the "Commission") and write in response to the Letter of Defendant Jason Sugarman ("Sugarman") (Dkt. 26) requesting a pre-motion conference. The Commission has no objection to the conference, and provides the following response to Sugarman's basis for his proposed motion to dismiss.

    "A motion to dismiss tests, not the truth of the complaint's allegations, but simply whether the allegations state a legal cause of action." *SEC v. Stoker*, 865 F. Supp. 2d 457, 458-59 (S.D.N.Y. 2012). The Commission need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept as true all fact allegations in the Complaint and draw all reasonable inferences in the Commission's favor. *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Under those standards, this Complaint more than states a plausible claim for relief, including that Sugarman had the requisite scienter. "The plaintiff establishes a strong inference of fraudulent intent by alleging facts sufficient to show strong circumstantial evidence of conscious misbehavior or recklessness." *SEC v. Sayid*, No. 17-cv-2630 (JFK), 2018 WL 357320, at *3 (S.D.N.Y. Jan. 10, 2018) (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995))

    The Complaint alleges that, as Galanis's 50/50 partner, Sugarman knew that the tribal bonds were a sham, that he knowingly participated in and benefitted from the misappropriation of bond proceeds, and that he worked to cover-up the theft. For example, it alleges that in April 2014, Galanis suggested to Sugarman that "we" can "arrange" for a tribe to acquire a $20 million insurance policy from Wealth Assurance by issuing bonds, saying: "[W]e would be appointed the discretionary manager over the policy" and would thus "have discretion over the bond." Galanis concluded: "Let's discuss how it can be allocated." (Complaint (DE 1) ("¶ __") ¶34.) On August 20, 2014, Galanis sent Sugarman a spreadsheet reflecting that $27.1 million of tribal bonds were sold to nine clients of Hughes Capital Management ("Hughes"). (¶45.) That day, Galanis also sent Sugarman a spreadsheet with a proposed allocation of the bond proceeds. Contrary to the deal he approved as a member of Burnham Securities' Investment Committee, which provided for proceeds to be invested in a Wealth Assurance annuity (¶46), the allocation Galanis and Sugarman shared did not reflect the purchase of an annuity, from Wealth Assurance

or anyone else. Instead, it showed the theft of all the bond proceeds, with more than $1 million to flow directly to Sugarman's benefit. (¶47.) Sugarman and Galanis then executed that misappropriation, including in ways contemplated in the proposed allocation: $47,500 of the proceeds was sent to Sugarman and $1.3 million was used to repay a Sugarman debt. (¶49.)

The Complaint further alleges that Sugarman also knew that no annuity was bought with the April 2015 bond proceeds because he was paid directly from the proceeds. Four days after the April 2015 bond issuance, Sugarman received over $230,000 from Wealth Assurance Private Client Corporation ("WAPCC"), the fake annuity provider that Galanis set up to misappropriate the bond proceeds. (¶¶48, 66.) As majority owner and a director and officer of Valor Group Ltd., the Wealth Assurance holding company (¶17), the Complaint alleges sufficient facts indicating that Sugarman knew, or was reckless in not knowing, that WAPCC was not a real Wealth Assurance affiliate. These facts all give rise to a strong inference of Sugarman's fraudulent intent.[1]

Sugarman claims that the Complaint improperly refers to actions taken by "Sugarman and Galanis (or vice versa)" without distinguishing what specifically Sugarman did. However, the Complaint alleges that Sugarman and Galanis were equal partners in the bond scheme. (¶ 19.) Where the Complaint refers to actions taken by "Sugarman and Galanis" (and vice versa), it is because they were both direct participants in those actions. In other instances, where only one of them participated in the action, the Complaint notes that with specificity. For example, paragraph 39 alleges how and when Sugarman held himself out as a Member and Manager of COR Capital; paragraph 38 alleges how and when Galanis used that information to further their joint scheme.

Contrary to Sugarman's contention, the Complaint pleads Sugarman's manipulative or deceptive acts in furtherance of the fraud. *See SEC v. Contrarian Press, LLC*, No. 16 Civ. 6964 (VSB), 2019 WL 1172268, at *4 (S.D.N.Y. Mar. 13, 2019) (denying motion to dismiss where complaint alleged deceptive act committed in furtherance of the alleged scheme with scienter). Those acts need not be directed at the ultimate victim of the fraud; they need only be acts that further the scheme. *Sayid*, 2018 WL 357320, at *7 (defendant's false opinion letters delivered to transfer agent were an "integral part of [other defendant's] pump and dump scheme" used to obtain unrestricted shares for sale); *see also SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (deceptive acts that furthered fraud were actionable "even if a material misstatement by another person creates the nexus between the scheme and the securities market"). Nor must those acts be inherently unlawful. *SEC v. Hui Feng*, __ F.3d __, 2019 WL 3977495, at *13 (9th Cir. Aug. 23, 2019) (citing *SEC v. Wey*, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017)).

Here, the Complaint alleges that Sugarman committed deceptive acts in the acquisition of Hughes, in disguising the source of proceeds in acquiring Valorlife, and in secretly funding WAPCC's interest payment on the bonds to forestall discovery of the scheme. When Sugarman

---

[1] These allegations further show how Sugarman erroneously relies on Judge Abrams' post-conviction decisions, including ignoring that Judge Abrams denied Defendant Cooney's motion for a new trial because "Cooney received money directly from the purported annuity provider [WAPCC] for the [tribal corporation] . . . It is unclear how Cooney could have received money from WAPC[C] for legitimate reasons." *United States v. Galanis,* 366 F. Supp. 3d 477, 508 (S.D.N.Y. 2018).

Hon. William H. Pauley III                                                                                      September 10, 2019
                                                                                                                                    Page 3

presented the proposal for funding needed to acquire Hughes to the board of Wealth Assurance – a deal that was central to the success of the first theft by providing buyers for the bonds – he did so via a memo he knew, but intentionally concealed, had been written by Galanis. (¶41.)

And when he steered $11 million in stolen bond proceeds to the seller of Valorlife for the 2014 acquisition, Sugarman contrived a circuitous route for the money to disguise its true origins and conceal the fraud by which he and Galanis had obtained it. (¶75.) The proceeds of the issuance ($20 million) were directed to a WAPCC bank account. From there, Sugarman and Galanis arranged for $3.895 million to be sent to Cooney, who forwarded the funds to a different Sugarman entity, Camden Escrow. (¶76.) After one more transfer to a law firm trust account, the Camden Escrow money was used a partial payment to the Valorlife seller. (*Id.*) Sugarman and Galanis routed the remaining $7 million through Thorsdale, Galanis's entity, and on to WAH NV (a Sugarman-related entity with a name similar to the real Wealth-Assurance Holdings (¶68)), and on to Valorlife's seller, thereby preserving the fiction that the money to buy Valorlife had a legitimate origin, and avoiding detection of the misappropriation. (¶77.)[2]

The Complaint further alleges that Sugarman (who had no role at WAPCC and claims no involvement in the issuance of the bonds) secretly contributed over $250,000 to WAPCC in September 2015 to fund a bond interest payment, to avoid a default that would have triggered an investigation of what WAPCC had done with the proceeds. (¶110-12.)

All of these acts were deceptive and each was designed to further the fraud and allow the scheme to continue undetected.

Finally, Sugarman asserts that the Complaint pleads facts insufficient to show that he substantially assisted the fraudulent scheme. But the Complaint satisfies the standard set in *SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012). Sugarman directly participated in ensuring that the fraud succeeded, by among other things, causing the Board of Wealth-Assurance to finance the purchases of Hughes and Atlantic and by taking steps to cover up the fraud once his 50/50 partner had been arrested. (¶¶ 41-43, 58, 111.)

In scheduling the Conference, the Commission respectfully requests that it be set for some time after September 23rd to accommodate trial counsel's long-scheduled family commitment out of town during the week of September 15th.

                                                                Respectfully submitted,

                                                                *Tejal Shah*
                                                                Tejal D. Shah

   cc:  Nancy Brown

---

[2] Sugarman's attempt to paint these tortured transactions as "normal business activities," is unavailing. Routing money through a series of intermediaries to disguise the source is deceptive. *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y 2016) (collecting cases).