UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                    :
SECURITIES AND EXCHANGE                             :
COMMISSION,                                         :          19cv5998
                                                    :
              Plaintiff,                            :          OPINION & ORDER
                                                    :
        -against-                                   :
                                                    :
JASON SUGARMAN,                                     :
                                                    :
              Defendant.                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

WILLIAM H. PAULEY III, Senior United States District Judge:

              The Securities and Exchange Commission ("SEC") brings this enforcement action

against Defendant Jason Sugarman for violations of the Securities Act of 1933 (the "Securities

Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules promulgated

thereunder.  The SEC alleges that Sugarman and his business partner, Jason Galanis, participated

in a scheme to defraud investors with bonds issued by the Wakpamni Lake Community

Corporation ("WLCC"), affiliated with the Wakpamni District of the Oglala Sioux Nation.

Sugarman moves to dismiss the SEC's Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6).  For the following reasons, Sugarman's motion is denied.

BACKGROUND

              Unless otherwise noted, the following facts are derived from the SEC's Complaint

and are accepted as true for purposes of this motion.

I.      Overview

Over a three-year period beginning in late 2013, Sugarman and Galanis,[1] along with their associates, perpetuated a massive fraud in which they stole approximately $43 million from investors to finance the acquisition of a global financial conglomerate.  (Compl., ECF No. 6 ("Compl."), ¶ 1.)  Along the way, they deceived a Native American tribal entity by convincing the WLCC to issue approximately $60 million in limited recourse bonds (the "Tribal Bonds") (Compl. ¶¶ 2, 4.)  Through a series of complex transactions, Sugarman and Galanis obtained control over two investment advisers, whose clients' funds were used to purchase the Tribal Bonds.  (Compl. ¶ 6.)  Instead of using the bond proceeds for the benefit of the WLCC, Sugarman and Galanis misappropriated them.  (Compl. ¶¶ 9–10.)

In 2016, the SEC filed suit against eight individuals alleging a fraudulent scheme in connection with the Tribal Bonds: Galanis, Devon Archer, Bevan Cooney, Hugh Dunkerley, John Galanis, Gary Hirst, Francisco Martin, and Michelle Morton.  See SEC v. Archer, No. 16-cv-3505 (S.D.N.Y.).

Concurrently, the United States Attorney's Office for the Southern District of New York filed parallel criminal charges against all of those defendants, except Martin.  See United States v. Galanis, No. 16-cr-371 (S.DN.Y.).  Four defendants—Galanis, Dunkerley, Hirst, and Morton—pled guilty.  Following a six-week criminal trial, a jury convicted the other three—John Galanis, Archer, and Cooney—of securities fraud and conspiracy to commit securities fraud.  Thereafter, Judge Abrams granted Archer's motion for a new trial under Federal Rule of

---

[1]      Unless otherwise specified, "Galanis" refers to Jason Galanis.

Criminal Procedure 33.  United States v. Galanis, 366 F. Supp. 3d 477, 480 (S.D.N.Y. 2018).

That decision is on appeal to the Second Circuit.[2]

Following the criminal trial, this Court entered consent judgments against

Galanis, Cooney, Dunkerley, John Galanis, Hirst, Martin, and Morton in the pending SEC

matter.  Archer, No. 16-cv-3505, ECF Nos. 221, 242–45, 254, 259.  In June 2019, the SEC filed

this action against Sugarman.

II.     Sugarman's Businesses and Relationship with Galanis

The SEC alleges that Sugarman and Galanis were business partners in the Tribal

Bonds scheme.  (Compl. ¶ 19.)  The two maintained a close relationship, and other scheme

participants referred to them as the "two Jasons" and "50/50 partners."  (Compl. ¶ 19.)  Before—

and during—the Tribal Bonds scheme, Sugarman was an officer, director, and indirect owner of

Wealth Assurance Holdings Ltd. ("WAH"), a Bermuda-based insurance company.[3]  (Compl.

¶¶ 14, 17.)  He was also a director, indirect owner, and member of the investment committee of

Burnham Securities ("Burnham"), a then-SEC-registered broker-dealer and investment adviser.

(Compl. ¶¶ 14, 16.)

Prior to the Tribal Bonds scheme, Sugarman and Galanis helped WAH acquire

Wealth-Assurance AG ("Wealth-Assurance"), a Liechtenstein-based insurance company,

through allegedly fraudulent means.  (Compl. ¶¶ 17(1), 21–29.)  On January 7, 2014, following

Sugarman and Dunkerley's presentation to the Wealth-Assurance board of directors (on which

they both sat), the Wealth-Assurance board approved a €4 million investment ($5.4 million) of

the company's capital in an Ireland-based fund called Ballybunion Caplain UK Focus Growth

---

[2]     Additionally, Morton filed a motion to withdraw her guilty plea, which is currently pending.

[3]     In December 2014, WAH changed its name to Valor Group Ltd.  (Compl. ¶¶ 14, 17.)  For clarity, this Opinion & Order will refer to both as "WAH."

Fund ("Ballybunion") for the fund to manage.  (Compl. ¶ 24.)  Sugarman then directed his assistant to incorporate a limited liability company in Nevada bearing the Ballybunion name, even though that entity had no connection to the Ballybunion fund in Ireland.  (Compl. ¶ 25.) Wealth-Assurance wired the €4 million investment to the "fake" Ballybunion company in Nevada.  (Compl. ¶¶ 26–27.)  After various intermediary transactions, the bulk of that money was transferred to WAH to purchase Wealth-Assurance.[4]  (Compl. ¶ 27.)  Put simply, Sugarman and Galanis directed WAH to acquire Wealth-Assurance using Wealth-Assurance's own capital. In the following months, Galanis covered up these transactions—with "Sugarman's knowledge and approval"—by taking steps to deceive Wealth-Assurance employees about the status of what they considered a legitimate investment.  (Compl. ¶¶ 30–31.)

III.     Tribal Bonds Scheme

Beginning in March 2014, Galanis and his father, John Galanis, initiated the larger scheme by convincing the WLCC to issue three tranches of limited recourse bonds totaling approximately $60 million.  (Compl. ¶¶ 32–33.)  According to the issuing documents, the WLCC planned to use the proceeds from the bond sales to purchase an annuity from Wealth-Assurance. (Compl. ¶ 33.)  However, the SEC alleges that Sugarman and Galanis intended to gain control over the bonds for their own benefit.  (Compl. ¶¶ 34–35.)

As part of the scheme, Sugarman helped finance the purchase of Hughes Capital Management, LLC ("Hughes"), a Virginia-based investment adviser with approximately $900 million under management.  (Compl. ¶¶ 7, 36–37.)  In June 2014, Morton presented Hughes's then-owner with a document titled "Introduction to COR Capital," which was authored by Galanis.  (Compl. ¶ 38.)  It listed several businesses that COR Capital purportedly owned, such

---

[4]        Sugarman also directed $800,000 from the Ballybunion account to an investment in COR Financial (HK)— a solar company in which he had an interest—and other money to a technology investment.  (Compl. ¶ 29.)

as Wealth-Assurance and Burnham Securities.  (Compl. ¶ 38.)  Sugarman held himself out as a

member and manager of COR Capital, and approved the introductory document.  (Compl. ¶ 39.)

A month later, Galanis sent Sugarman a copy of the executed term sheet for the Hughes

acquisition and noted: "[W]e get discretion over $900 million."  (Compl. ¶ 40 (alteration in

original).)

       According to the SEC, Sugarman had Galanis ghostwrite a memo to the board of

directors of Wealth-Assurance recommending the acquisition.  (Compl. ¶ 41.)  The SEC alleges

that Sugarman sought to conceal Galanis's involvement because of Galanis's prior securities

violations.  (Compl. ¶ 41 & n.3.)  In August 2014, the Wealth-Assurance board of directors

(which included Sugarman) discussed the memo and approved the purchase of Hughes through

its subsidiary, BFG Investments.[5]  (Compl. ¶¶ 43–44.)

       Soon after the acquisition of Hughes, Galanis forwarded Sugarman a spreadsheet

and trade blotter indicating that nine of Hughes's clients purchased approximately $27 million of

the Tribal Bonds.  (Compl. ¶ 45.)  Burnham served as the placement agent for this transaction.

(Compl. ¶ 45.)  According to the SEC, Sugarman knew from Galanis that the proceeds from the

Tribal Bond sales were meant to be used to purchase an annuity from Wealth-Assurance.

(Compl. ¶ 46.)  To supplement this allegation, the SEC also contends that Sugarman knew (or

was reckless in not knowing) this information because he was a member of Burnham's

investment committee.  (Compl. ¶ 46.)  Galanis then sent Sugarman a spreadsheet describing the

proposed allocation of the Tribal Bond proceeds, without any reference to an anticipated annuity.

(Compl. ¶ 47.)  As described below, Sugarman and Galanis then gained access to and

misappropriated the proceeds from the sale of Tribal Bonds to Hughes's clients.  (Compl. ¶ 8.)

---

[5]     Specifically, BFG Investments made a capital contribution to GMT Duncan LLC ("GMT"), who then purchased Hughes.  (Compl. ¶¶ 17(1), 44.)  GMT was Hughes's and AAM's parent company.  (Compl. ¶ 18.)

Sugarman and Galanis replicated the Hughes scheme with their acquisition of Atlantic Asset Management LLC ("AAM"), an investment manager with $11 billion in assets under management.  (Compl. ¶¶ 7, 54.)  In November 2014, Sugarman and Galanis arranged for Wealth-Assurance to purchase Valorlife Lebensversicherungs AG ("Valorlife"), a Lichtenstein-based insurer, using $11 million in Tribal Bond proceeds.  (Compl. ¶ 17(2).)  At Sugarman's direction, Dunkerley provided AAM's general counsel with a letter on behalf of the "COR Group of Companies, Inc." regarding financing.  (Compl. ¶ 57.)

In April 2015, Sugarman and Galanis obtained authorization from Valorlife's board of directors to finance the purchase of AAM.  (Compl. ¶ 58.)  After the purchase, Galanis kept Sugarman apprised by email about possible investment decisions.  (Compl. ¶¶ 62–63.)  Thereafter, Burnham acted as the placement agent of the new $16.2 million issuance of Tribal Bonds.  (Compl. ¶ 65.)

IV.   Misappropriation

The SEC alleges that Sugarman directly and indirectly misappropriated bond proceeds meant for the WLCC.  Galanis set up a sham entity, Wealth Assurance Private Client Corporation ("WAPCC"), as a purported annuity provider even though it had no relationship with Wealth-Assurance.  (Compl. ¶ 48.)  Most of the Tribal Bond proceeds were diverted from WAPCC to Thorsdale Fiduciary and Guaranty Company Ltd. ("Thorsdale"), a Galanis company.  (Compl. ¶¶ 15, 49.)  The proceeds were then sent directly to various scheme participants or their related entities, such as Wealth Assurance Holdings, Ltd. ("WAH NV").  (Compl. ¶¶ 67–68.)  And as was typical in this scheme, WAH NV bore a similar name to WAH, but maintained no real relationship with the company.  (Compl. ¶ 68.)  Overall, Sugarman netted approximately $9

million through this scheme, including $524,500 directly from the Tribal Bond proceeds in five transfers to him or his wife, including one directly from WAPCC.  (Compl. ¶¶ 2, 70.)

The Complaint describes a laundry list of related transactions under the umbrella of misappropriation, such as: (1) Sugarman and Galanis using bond proceeds to purchase new tranches of Tribal Bonds (the "Rosemont Bond" and "Cooney Bond") to acquire companies like Valorlife, and meet Burnham's net capital requirements, (Compl. ¶¶ 51–52, 71–91); (2) repaying a $1.3 million debt that Sugarman and Galanis owed to Hirst as part of their purchase of Wealth-Assurance, (Compl. ¶¶ 92–94); (3) injecting Hughes and AAM with cash, including a portion of the bond proceeds that were supposed to be invested in annuities, (Compl. ¶¶ 95–99); (4) purchasing securities in Code Rebel Corporation, a company that was engaging in an IPO, and in which Sugarman had investments, (Compl. ¶¶ 100–09); and (5) in September 2015 following Galanis's arrest, wiring money to WAPCC—the fake annuity provider—to cover its interest obligations due to bondholders, (Compl. ¶¶ 110–12).

The SEC alleges primary violations under: Sections 17(a)(1) and (3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and (3); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); and Rules l0b-5(a) and (c), 17 C.F.R. §§ 240.10b-5(a) and (c).  Additionally, the SEC alleges secondary violations under: Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b); and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), for aiding and abetting Galanis's primary violations.

<u>DISCUSSION</u>

I.    <u>Legal Standard</u>

On a motion to dismiss, a court accepts all facts alleged in the complaint as true and construes all reasonable inferences in a plaintiff's favor.  <u>ECA, Local 134 IBEW Joint</u>

Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). Nevertheless, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted). To survive a motion to dismiss, the court must find the claim rests on factual allegations that "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." (quotation marks omitted)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Moreover, claims sounding in securities fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127–28 (2d Cir. 1994). "Because Rule 9(b) offers defendants important protections, the Second Circuit applies Rule 9(b)'s heightened standard not only to claims explicitly alleging fraud, but also to claims sounding in fraud, such as where 'the wording and imputations of the complaint are classically associated with fraud.'" SEC v. Egan, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (quoting Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004)). However, the SEC need not satisfy the pleading requirements under the Private Securities Litigation Reform Act ("PSLRA"). SEC v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014); see also 15 U.S.C. § 78u-4(a)(1).

Nonetheless, in addition to providing a facially plausible claim to relief, the SEC "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P.

9(b).  Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), the relaxation of the particularity requirement for conditions of mind must not be mistaken for a "license to base claims of fraud on speculation and conclusory allegations," Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (quotation marks omitted).  The SEC must "allege facts that give rise to a strong inference of fraudulent intent."  Chill v. Gen. Electric Co., 101 F.3d 263, 267 (2d Cir. 1996) (emphasis omitted) (quoting Acito, 47 F.3d at 52).  This inference can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Acito, 47 F.3d at 52 (quoting Shields, 25 F.3d at 1128).

## II.    Primary Liability

Section 10(b) of the Exchange Act, in relevant part, makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  In turn, Rule 10b-5 makes it unlawful to: (a) "employ any device, scheme, or artifice to defraud"; (b) "make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made . . . not misleading"; or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities.  17 C.F.R. § 240.10b-5.

Section 17(a)(1) of the Securities Act makes it unlawful to "employ any device, scheme, or artifice to defraud" in the offer or sale of securities.  15 U.S.C. § 77q(a)(1).  "'Essentially the same elements are required under Section 17(a)(1)' as under Section 10(b) and

Rule 10b-5, except that Section 17(a)(1) requires proof of a connection with the 'offer or sale' of securities, instead of the 'purchase or sale' of securities." SEC v. Thompson, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (quoting SEC. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)).

And Section 17(a)(3) of the Securities Act prohibits defendants from engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). This provision has almost identical elements as Section 10(b) and Section 17(a)(1), except that "[s]cienter is not required to prove a defendant violated" the statute. SEC v. Ginder, 752 F.3d 569, 574 (2d Cir. 2014) (citing Aaron v. SEC, 446 U.S. 680, 696–97 (1980)). Rather, "[a] showing of negligence is sufficient." Ginder, 752 F.3d at 574.

Analyzing these provisions together, Section 10(b) of the Exchange Act, Rules 10b-5(a) and (c), and Sections 17(a)(1) and (3) of the Securities Act "create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." SEC v. Jean-Pierre, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015); see also In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 160 (S.D.N.Y. 2012) (noting that deceptive conduct may give rise to scheme liability under Rules 10b-5(a) and (c)). To state a claim for scheme liability, the SEC must allege that the defendant "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) [with] scienter." SEC v. Lee, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (quotation marks omitted). A "manipulative or deceptive act" is "some act that gives the victim a false impression." United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008). To establish liability, defendants "must have participated in an illegitimate, sham or inherently deceptive transaction where [their] conduct or role ha[d] the purpose and effect of

creating a false appearance."  SEC v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 445

(E.D.N.Y. 2016) (alterations in original) (quotation marks omitted); accord Gruber v. Gilbertson,

2018 WL 1418188, at *14 (S.D.N.Y. Mar. 20, 2018).

    a.  Particularity Standard

        As an initial matter, Sugarman contends that the Complaint does not satisfy Rule

9(b)'s particularity standard because it: (1) fails to distinguish between Sugarman and Galanis's

conduct by lumping allegations against the individuals together, and (2) uses innuendo to

consistently associate Sugarman with Galanis.  (Mem. of Law in Supp. of Jason Sugarman's

Mot. to Dismiss the Compl., ECF No. 39 ("Def.'s Mem."), at 10–15.)

        "Where multiple defendants are asked to respond to allegations of fraud, the

complaint should inform each defendant of the nature of his alleged participation in the fraud."

DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).  Rule 9(b) is

not satisfied by a complaint in which "defendants are clumped together in vague allegations."

Three Crown Ltd. P'ship v. Caxton Corp., 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993).  "To this

end, the complaint may not rely upon blanket references to acts or omissions by all of the

defendants, for each defendant named in the complaint is entitled to be appraised of the

circumstances surrounding the fraudulent conduct with which he individually stands charged."

Red Ball Interior Demolition Corp. v. Palmadessa, 874 F. Supp. 576, 584 (S.D.N.Y. 1995);

accord In re Blech Sec. Litig., 928 F. Supp. 1279, 1292–93 (S.D.N.Y. 1996).

        Here, the SEC frequently combines the conduct of Sugarman with Galanis by

referring to the pair together as "Sugarman and Galanis" throughout the Complaint.  However,

many of these references to "Sugarman and Galanis" explain their collective scheme.  (See, e.g.,

Compl. ¶ 6 ("Sugarman and Galanis devised a plan to obtain control over investors' funds by

acquiring investment advisers . . . ."), Compl. ¶ 10 ("Sugarman, Galanis, and [their associates] divvied up the misappropriated proceeds . . . ."); see also, e.g., Compl. ¶¶ 7, 9, 21, 32, 36, 54.) Moreover, the majority of the Complaint specifies each one's conduct in the scheme.  (See, e.g., Compl. ¶¶ 37–53 (Sugarman and Galanis's respective roles in the Hughes acquisition), Compl. ¶¶ 54–66 (Sugarman and Galanis's respective roles in the AAM acquisition), Compl. ¶ 70 (chart showing bond proceeds sent to Sugarman), Compl. ¶¶ 84–89 (Sugarman's acquisition of VL Assurance using the Rosemont Bond and direction of its funds), Compl. ¶¶ 110–12 (Sugarman's payment of WAPCC's interest obligations).)

Although lumping defendants together in vague allegations is generally inappropriate, the case law Sugarman cites is distinguishable.  For example, in Three Crown, the complaint consistently labeled multiple defendants together as "some or all of the defendants" without providing particularized facts as to why each defendant should be implicated in the alleged market manipulation scheme.  817 F. Supp. at 1040.  Similarly, in Filler v. Hanvit Bank, the court dismissed fraud claims because the "complaints [did] not make allegations with respect to each defendant, but instead refer[red] only generally to the defendants as 'the Banks' or 'the Korean Banks.'"  2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003).  But these cases, and others cited by Sugarman, do not stand for the proposition that a pleading must fail if more than one defendant allegedly carried out their conduct in tandem.  Instead, these claims were dismissed under Rule 9(b) because the plaintiffs did not "specify [the defendants'] respective roles in the [scheme]."  Three Crown, 817 F. Supp. at 1040.  This Court can hardly fault the SEC for the fact that Sugarman and Galanis acted in concert.  And while, as explained below, not all of the SEC's allegations pass muster under the securities laws, the Complaint adequately puts Sugarman on notice of his role in the allegedly fraudulent scheme.

12

Relatedly, Sugarman contends that the SEC cannot satisfy Rule 9(b) with "conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others."  Kolbeck v. LIT Am., Inc., 923 F. Supp. 557, 569 (S.D.N.Y. 1996).  The SEC alleges that Sugarman and Galanis were business partners in the Tribal Bonds scheme.  (Compl. ¶¶ 5, 19.)  Although simply labeling Sugarman and Galanis "50/50 partners" or the "two Jasons" is not, in itself, enough to establish liability, it is plausible—and the SEC pleads—that the two acted in concert throughout this endeavor.  See SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 486 (S.D.N.Y. 2007) ("Several persons may act in concert to commit a violation of section 10(b) that might not be actionable were it not for their cooperation.");  see also SEC v. Espuelas, 698 F. Supp. 2d 415, 435 (S.D.N.Y. 2010) (finding that the SEC adequately pled fraudulent conduct and scienter although the complaint made "substantially similar allegations" against two defendants).

Nonetheless, the Complaint contains allegations that Galanis and other scheme participants carried out acts taken with Sugarman's "knowledge and approval" or "knowledge and consent."  (See, e.g., Compl. ¶¶ 8, 9, 30, 67, 82, 93, 97.)  Many of these assertions are conclusory, and this Court will disregard them unless otherwise supported by particularized factual allegations.  See, e.g., PetEdge, Inc. v. Garg, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (describing assertions that individuals acted "at [defendant's] direction," "as part of [defendant's] scheme to defraud [the plaintiff]," and "with his knowledge and approval" as conclusory and dismissing those unsupported by particularized factual allegations (quotation marks omitted)); In re NQ Mobile, Inc. Sec. Litig., 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015) (finding claims that a defendant performed audit services "on the authority of, at the direction of, under the control of, and for the sole benefit of" another defendant to be "conclusory allegations" with

"no facts to substantiate" them).

b. Deceptive Acts

Sugarman argues that the SEC has not adequately pled that he committed the requisite deceptive or manipulative acts sufficient to state a claim for scheme liability.[6]  (Def.'s Mem., at 15.)  In contrast, the SEC alleges that Sugarman was the "mastermind" or "architect" of the scheme based on his deceptive conduct.  (Pl. SEC's Mem. of Law in Opp'n to Def's Mot. to Dismiss, ECF No. 42 ("SEC's Mem."), at 11.)  Therefore, the SEC contends that Sugarman is inherently liable as a primary violator.  See, e.g., VanCook v. SEC, 653 F.3d 130, 139 (2d Cir. 2011) (finding "architect" of trading scheme violated scheme provisions); see also CKB168 Holdings, Ltd., 210 F. Supp. 3d at 446 ("Apart from [defendant's] deceptive promotional acts, his role as scheme architect makes him liable as a matter of law."); In re Glob. Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) ("[Defendant's] allegedly central role in these schemes, as their chief architect and executor, leaves no doubt as to [his] potential liability as a primary violator under section 10(b).").  However, merely labeling Sugarman a "mastermind" or "architect" of the scheme is inadequate to establish liability.  Therefore, this Court must analyze Sugarman's allegedly deceptive or manipulative acts that constitute his involvement in this scheme.

i. Hughes Acquisition

The Hughes acquisition was a key component of the overall Tribal Bonds scheme because the scheme participants utilized Hughes's clients' funds to purchase the Tribal Bonds. However, the parties spar over: (1) whether Sugarman's conduct was inherently deceptive; and (2) whether his conduct was "in connection with the purchase or sale" of securities, 15 U.S.C. §

---

[6]     Sugarman does not move to dismiss the primary violations on scienter grounds.  (Def.'s Mem., at 10 n.7.)

78j(b); 17 C.F.R. § 240.10b-5, or "in the offer or sale" of securities, 15 U.S.C. § 77q(a).

First, there is little doubt that Sugarman played a central role in the Hughes acquisition. (Compl. ¶¶ 37–53.) Specifically, the SEC alleges that Sugarman presented a memo—purportedly written by Dunkerley but ghostwritten by Galanis—to the Wealth-Assurance board of directors regarding the purchase of Hughes.[7] (Compl. ¶¶ 41–43.) And the SEC alleges that the minutes from the board meeting—during which the transaction was consummated—reflect that the investment was Sugarman and Dunkerley's proposal. (Compl. ¶ 43.) Thus, Sugarman's "course of conduct may not have been inherently unlawful, but it was deceptive." SEC v. Wey, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017); accord SEC v. Hui Feng, 935 F.3d 721, 737 (9th Cir. 2019) ("[D]eceptive conduct that is not inherently unlawful may form the basis of a scheme to defraud." (quotation marks omitted)).

Moreover, the memo was misleading. It mentioned that WAH had "referred" an investment proposal to Wealth-Assurance that included a recommendation that the investment was conditioned on a $12 million purchase of WAH's Class B shares. (Compl. ¶¶ 41–42.) Instead of buying WAH's Class B shares, the SEC alleges that Sugarman and Galanis recycled the Tribal Bond proceeds to fund the Rosemont Bond, the Cooney Bond, and purchase other entities, such as Valorlife. (Compl. ¶¶ 50–52, 73–79.) And according to the Complaint, gaining discretion over Hughes's clients' funds to direct their investments was the initial purpose of the transaction.[8] (Compl. ¶¶ 40, 42.)

---

[7]    Although the Complaint pleads that "Sugarman had Galanis draft a memo," it is plausible that Sugarman directed Galanis's conduct because he sent Sugarman drafts of the memo on August 5 and August 7, 2014 for Sugarman's comments. (Compl. ¶ 41 (emphasis added).)

[8]    Recently, in Lorenzo v. Securities and Exchange Commission, 139 S. Ct. 1094 (2019), the Supreme Court expanded the scope of scheme liability claims under the securities laws. Specifically, the Supreme Court held that the "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, . . . even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." Lorenzo, 139 S. Ct. at 1100–01. Neither party briefed this issue, and at this stage, this

To counter this point, Sugarman attaches to his motion papers an exhibit of Wealth-Assurance's official board minutes from January 7, 2014 that references Galanis's role as a potential consultant for the board.  (Decl. of David M. Zinn in Supp. of Jason Sugarman's Mem. of Law in Supp. of his Mot. to Dismiss the Compl., ECF No. 40, Ex. B.)  Sugarman claims that this document shows that the Wealth-Assurance board knew Galanis was working for the company, and therefore, concealing his role could not have been inherently deceptive.  (Def.'s Mem., at 16.)

In determining whether dismissal is warranted, a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013).  Although the Complaint references the January 7, 2014 board meeting in the context of the Ballybunion transaction, (Compl. ¶ 24), "a general allusion to these documents is insufficient to deem them incorporated by reference," Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 28 (S.D.N.Y. 2019).  Moreover, even if the Complaint relied on these minutes, the SEC disagrees with Sugarman's factual interpretation of them.  (SEC's Mem., at 13 n.4.)  And it is long-settled in this Circuit that a court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Schwab v. E*Trade Fin. Corp., 285 F. Supp. 3d 745, 749 (S.D.N.Y. 2018) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).  Therefore, this Court declines to

---

Court need not delve further into whether Sugarman's conduct includes the "dissemination of false or misleading statements with intent to defraud" as envisioned by Lorenzo.  However, this Court notes that using "false representations to induce the purchase of securities would seem a paradigmatic example of securities fraud." Lorenzo, 139 S. Ct. at 1103.

consider the board minutes in its evaluation of Sugarman's motion.

Second, the SEC adequately alleges that Sugarman's conduct was "in connection with the purchase or sale" and "in the offer or sale" of securities.  See 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.  "In its role enforcing the Act, the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'"  SEC v. Zandford, 535 U.S. 813, 819 (2002).  Indeed, "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else."  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006); accord Wey, 246 F. Supp. 3d at 913–14. But "[c]onduct that is merely incidental or tangentially related to the sale of securities will not meet the 'in connection with' requirement."  Leykin v. AT & T Corp., 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006), aff'd, 216 F. App'x 14 (2d Cir. 2007).

Here, the SEC alleges that the purchase of Hughes was an integral step in the larger scheme that specifically entailed gaining access to client funds to sell those clients sham securities—the Tribal Bonds.  Although the purchase of Hughes may have appeared "legitimate," Leykin, 423 F. Supp. 2d at 242, the acquisition employed deceptive conduct necessary to execute the Tribal Bonds scheme.[9]  Moreover, the investment memo explicitly included a recommendation that the Hughes investment be conditioned on Wakpamni Investments' purchase of $12 million of WAH's Class B shares.  (Compl. ¶¶ 42, 50.)  Therefore, Sugarman's deceptive role in the acquisition of Hughes and the subsequent sale of Tribal Bonds

---

[9]     The Complaint alleges that "Galanis, Morton and Hirst, acting with Sugarman's knowledge and consent, directed Hughes's clients' purchases of the first $27 million tranche of bonds."  (Compl. ¶ 8 (emphasis added).)  As mentioned, allegations that an individual acted with another's "knowledge and consent" are wholly conclusory. Here, the SEC pleads that Galanis forwarded Sugarman a CUSIP for the Tribal Bonds, as well as a spreadsheet and trade blotter reflecting Hughes's clients' purchase of the bonds.  (Compl. ¶ 45.)  This aligns with the SEC's allegation that Sugarman and Galanis intended to purchase Hughes to direct their clients' funds into Tribal Bonds. (Compl. ¶ 42.)  Therefore, while Sugarman may not have actually purchased the Tribal Bonds on behalf of Hughes's clients himself, the SEC adequately pleads that Sugarman knew about these planned transactions and sales.

to Hughes's clients—which Sugarman allegedly knew about from the beginning—comports with

the "broad interpretation" of the phrase "in connection with the purchase or sale" of securities in

the context of Section 10(b) and Rule 10b-5.  Dabit, 547 U.S. at 85; Monarch Funding Corp.,

192 F.3d at 308 ("Essentially the same elements are required under Section 17(a)(1)–(3) in

connection with the offer or sale of a security."); see also, e.g., SEC v. Sayid, 2018 WL 357320,

at *7 (S.D.N.Y. Jan. 10, 2018) (finding attorney's opinion letters delivered to transfer agent were

an "integral part of [defendant's] overarching pump and dump scheme" and that attorney "knew

or should have known that his false representations would be used to erroneously issue

[unregistered] shares of . . . stock"); Wey, 246 F. Supp. 3d at 913–14, 917 (concluding SEC

adequately alleged participation in a fraudulent scheme "in connection with the purchase or sale"

and "in the offer or sale" of securities based on misrepresentations to assist a company in

obtaining listings on NASDAQ).

ii.   Additional Deceptive Acts

The SEC is not required to allege that Sugarman "participated in each and every

aspect of the fraudulent scheme" to establish scheme liability.  Wey, 246 F. Supp. 3d at 916.

Indeed, as Sugarman points out, many of the SEC's allegations focus solely on Galanis's specific

conduct.  (See, e.g., Compl. ¶¶ 4, 29–30, 45.)  However, at the motion to dismiss stage, the SEC

must only allege Sugarman "engaged in deceptive conduct that contributed to the larger

scheme."  SEC v. Sason, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020).  The SEC has met that

burden.

For example, prior to the Tribal Bonds scheme,[10] Sugarman convinced Wealth-

---

[10]   Sugarman contends that this transaction is not part of the overall scheme, and therefore this Court should
disregard this separate, earlier event.  (Reply Mem. in Supp. of Jason Sugarman's Mot. to Dismiss the Compl., ECF
No. 45, at 1.)  However, Sugarman points to no case law that limits this Court's ability to draw from the entire

Assurance's board of directors to approve a €4 million investment of the company's capital in the Ballybunion fund in Ireland.  (Compl. ¶ 24.)  Sugarman then directed his assistant to incorporate a limited liability company in Nevada bearing the same Ballybunion name, which had no real relationship to the Irish fund.  (Compl. ¶ 25.)  Wealth-Assurance ultimately wired the €4 million to the sham Ballybunion company, and after various transactions, the funds were used by WAH to purchase Wealth-Assurance.  (Compl. ¶¶ 26–27.)  By directing his assistant to create this sham account and then hiding the source of Wealth-Assurance's purchase through a series of fraudulent transactions, the Complaint pleads inherently deceptive acts.  See SEC v. Penn, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (finding that by "disguising the ultimate recipient of . . . funds through sham transactions, [defendant] engaged in an inherently deceptive act"); In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d at 161 (creation and use of intermediary entity to conceal identity of transaction's beneficiary is deceptive).

Similarly, the SEC alleges that Sugarman and Galanis installed Dunkerley to act as the sole director and nominee president of WAH NV, which helped purchase Valorlife. (Compl. ¶¶ 68, 76–77.)  "[K]nowingly supervising employees who are carrying out a fraudulent scheme is itself the employment of a deceptive device."  See Collins & Aikman Corp., 524 F. Supp. 2d at 495.  Moreover, like the Ballybunion transaction, the money for this purchase took a circuitous route, which the SEC alleges was designed to disguise the source of the funds using two Sugarman-affiliated entities, WAH NV and Camden Escrow.  (Compl. ¶¶ 73–77.)  Thus, the purchase of Valorlife was accomplished through allegedly deceptive conduct.  And it was similarly deceptive to conceal these transactions during the purchase of AAM, which allowed Sugarman and Galanis to sell additional tranches of Tribal Bonds.  This conduct is sufficient to

---

pleading to determine whether the SEC's Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (quotation marks omitted).

state a claim for a primary violation.  See, e.g., Penn, 225 F. Supp. 3d at 236 ("Routing the money to [two defendant-controlled entities] through [a separate entity] served no legitimate purpose and was an obvious attempt to shield [defendant's] theft from the Fund's auditors and participants."); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 493 (S.D.N.Y. 2005) (concluding that transactions were deceptive because they "created an appearance of substance where substance was lacking" and therefore were subject to Rules 10b-5(a) and (c)).

Although the Complaint alleges that both "Sugarman and Galanis" carried out the Valorlife transactions together, these allegations are sufficient under Rule 9(b).  In a separate complaint in the Archer civil matter, the SEC alleged that "Jason Galanis had signing authority over Thorsdale's bank account, held its only debit card, and directed all the wires that Thorsdale sent that were funded by bond proceeds from the WAPCC Account."  Archer, No. 16-cv-3505, ECF No. 88, ¶ 88.  Sugarman cites New Hampshire v. Maine, 532 U.S. 742 (2001), for the proposition that once a government plaintiff assumes and benefits from a certain factual position in litigation, it will be estopped from assuming a contrary position in a new complaint. "Typically, judicial estoppel will apply if: 1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel."  DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (quoting Maine 532 U.S. at 750–51).  Moreover the Second Circuit limits "judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain."  Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 148 (2d Cir. 2005) (quoting Simon v. Safelite Glass Corp., 128 F.3d 68, 72 (2d Cir. 1997)).

However, the judicial estoppel doctrine is inapplicable.  The SEC's current position that Sugarman and Galanis directed a large portion of the bond proceeds to be sent from Thorsdale is not "clearly inconsistent," Maine, 532 U.S. at 750, with its earlier position that Galanis had signing authority over Thorsdale's bank account and directed its wires.  For example, the SEC alleges that WAH NV's bank account statements were sent to an office in California that Sugarman and his brother used in connection with various businesses.  (Compl. ¶ 68.)  Construing all reasonable inferences in the plaintiff's favor, as this Court must, it is plausible that Sugarman had a role in directing the proceeds from Thorsdale to WAH NV, even if Galanis had actual control of the account.

       iii.    Misappropriation

The SEC alleges that Sugarman is also liable because "misappropriation is inherently deceptive" and is enough to state a claim for a violation of the securities laws.  (SEC's Mem., at 13.)  The SEC is incorrect as a matter of law.  While "conduct itself can be deceptive," and may give rise to liability under Section 10(b) or Rule 10b-5 without "a specific oral or written statement," Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 158 (2008), deceptive conduct "irreducibly entails some act that gives the victim a false impression," Finnerty, 533 F.3d at 148.  Indeed, in Finnerty, the Second Circuit explained that "[t]heft not accomplished by deception (e.g., physically taking and carrying away another's property) is not fraud absent a fiduciary duty."  533 F.3d at 148 (quotation marks omitted).  Similarly, in Zandford, when discussing the "in connection with" requirement under Section 10(b) and Rule 10b-5, the Supreme Court distinguished securities violations from situations in which "a lawful transaction had been consummated, [and] a broker decided to steal the proceeds and did so."  Zandford, 535 U.S. at 820.  Likewise, when "a thief simply invest[s] the proceeds of a routine

conversion in the stock market," that does not automatically spawn a securities violation. Zandford, 535 U.S. at 820.

These cases make clear that courts must parse fraud allegations to distinguish between misappropriation that is a mine-run conversion, and misappropriation through deceptive conduct.  Therefore, while there is nothing "inherently deceptive" about stealing money, the misappropriation of funds—when accomplished by deceptive acts—may be indicative of scheme liability.  See, e.g., Gruber, 2018 WL 1418188, at *14 ("[Defendants] caused the Company to award their family members a substantial amount of shares, which were then transferred to them—a telltale sign of deceptive conduct."); China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d at  392 ("[T]he SEC has competently pled the existence of a larger scheme, one that went beyond mere misrepresentations to investors, whereby defendants enriched themselves and their families at shareholders' expense.").

The Complaint alleges that Sugarman (and Galanis) were intimately involved in securities transactions and diverted funds directly and indirectly from WAPCC, instead of using the funds to purchase an annuity for the WLCC.  (Compl. ¶¶ 46–53, 66–70.)  Sugarman was not simply helping Galanis steal from investors, but actively participating in a larger scheme in which multiple other entities were purchased with misappropriated funds, failing to disclose the source of these funds, and actively trying to cover-up their scheme by diverting money back to Hughes and AAM.  (Compl. ¶¶ 71–112.)  And the SEC alleges that Sugarman profited from the scheme by siphoning nearly $9 million, including direct payments from the bond proceeds: (1) $236,000 from WAPCC (the sham annuity provider); (2) about $240,000 from WAH NV (his affiliated entity); and (3) $47,500 from Thorsdale (Galanis's entity).  (Compl. ¶¶ 2, 70.) Therefore, the SEC has adequately pled primary violations under a theory of scheme liability.

III.     Secondary Liability

Section 15(b) of the Securities Act provides that in actions brought by the SEC "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this subchapter, or of any rule or regulation issued under this subchapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  15 U.S.C. § 77o(b).  "Because the operative language in [Section] 15(b) is nearly identical to that in [Section] 20(e), the standard for aiding and abetting liability is the same under both statutes."  SEC v. Lek Sec. Corp., 276 F. Supp. 3d 49, 61 (S.D.N.Y. 2017); 15 U.S.C. § 78t(e). To state a claim for aiding and abetting, the SEC must allege: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  SEC v. Apuzzo, 689 F.3d 204, 211 (2d Cir. 2012) (quotation marks omitted).[11]  Sugarman disputes neither Galanis's primary violations nor the fact that Sugarman provided substantial assistance. (Def.'s Mem., at 22–23.)  Instead, he contends that he did not know he was providing substantial assistance to a fraudulent scheme.

Here, the Complaint is replete with allegations of Sugarman's knowledge (or at least recklessness) and his high degree of substantial assistance to the scheme to defraud.  As an initial matter, the allegation that "Sugarman knew from Galanis that the proceeds from the Bond sales were supposed to be used by the [WLCC] to purchase an annuity . . . from Wealth-

---

[11]     In 2010, Congress amended aider and abettor liability to include any person who "knowingly or recklessly provides substantial assistance to another person['s]" violation.  See 15 U.S.C. § 78t(e); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Title VII, § 9290, 124 Stat. 1761, 1862, 1865 (2010) (emphasis added).

Assurance" is plainly conclusory and will be disregarded.[12]  (Compl. ¶ 46.)  That being said, in the same paragraph, the SEC pleads that Sugarman knew (or was reckless in not knowing) that the Tribal Bonds were intended to be invested in an annuity because of his "review" of the transaction as a member of Burnham's investment committee.  (Compl. ¶ 46)  Sugarman also indirectly owned an interest in Burnham and was a member of its board of directors.  (Compl. ¶ 16.)  These allegations are sufficient at this stage, especially in light of the fact that "a high degree of substantial assistance may lessen the SEC's burden in proving <u>scienter</u>."  <u>Apuzzo</u>, 689 F.3d at 215 (emphasis in original).

        To further indicate Sugarman's knowledge of the scheme, the SEC alleges that Sugarman received a spreadsheet from Galanis about the real proposed allocation of the proceeds, which did not include an annuity.  (Compl. ¶ 47.)  The Complaint consistently asserts that Sugarman knew that the funds he received were from WAPCC (the fake annuity provider) or were sent from other related entities.  (Compl. ¶¶ 66, 70, 75–77, 100.)  He also allegedly knew the bonds had no inherent value, as evidenced by his transfer of a portion of the Rosemont Bond so that Burnham could maintain its net capital requirements.  (Compl. ¶¶ 71, 91.)

        Moreover, the SEC alleges that Sugarman secretly funded WAPCC's interest payment on the Tribal Bonds to forestall discovery of the scheme by instructing his attorney to wire $250,000 to WAPCC.  (Compl. ¶¶ 110–11.)  Sugarman argues that his payment was not deceptive, and the Complaint describes other occasions when Sugarman arranged or advanced funds for his and his associates' business ventures.  (<u>See, e.g.</u>, Compl. ¶¶ 19, 96.)  But at the motion to dismiss stage, the SEC is only required to "state a claim to relief that is plausible on its face."  <u>Iqbal</u>, 556 U.S. at 678 (quotation marks omitted).  Here, it is plausible that Sugarman

---

[12]        This Court also notes that the transaction being approved "in a meeting attended by at least Dunkerley" does not speak to Sugarman's own conduct.  (Compl. ¶ 46.)

wired the money to WAPCC to "deflect scrutiny of their scheme" because WAPCC was a fake annuity provider set up by Galanis, and Galanis was arrested in a separate matter at the time. (Compl. ¶¶ 110–11.)  This interest payment, which was allegedly designed to cover-up the scheme, helps establish Sugarman's assistance in facilitating Galanis's primary violations. Therefore, the SEC has pled a claim for secondary liability.

<u>CONCLUSION</u>

For the foregoing reasons, Sugarman's motion to dismiss is denied.  The Clerk of Court is directed to terminate the motion pending at ECF No. 38.

Dated: September 30, 2020
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.